IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRECISION INDUSTRIAL EQUIPMENT | : | CIVIL ACTION |
| | : | NO. 14-3222 |
| v. | : | |
| | : | |
| IPC EAGLE | : | |

O'NEILL, J.                                                         January 14, 2016

## MEMORANDUM

Plaintiff Precision Industrial Equipment has sued defendant IPC Eagle alleging various state law claims.  Defendant has asserted two counterclaims.  Now before me is defendant's motion for summary judgment on all claims and counterclaims (Dkt. No. 31), plaintiff's response (Dkt. No. 35) and defendant's reply (Dkt. No. 37).  I held oral argument on the motion.  Dkt. No. 43.  For the reasons that follow, I will grant in part and deny in part defendant's motion.

## BACKGROUND

Plaintiff Precision is a seller and servicer of industrial and commercial cleaning and maintenance equipment.  Dkt. No. 3 at ¶ 7.  Defendant IPC is a manufacturer of cleaning equipment and machines; it sells its products throughout the United States.  Dkt. No. 37-2 at ¶¶ 2-3.  Defendant often makes agreements with distributors to market and sell its products.  Id. at ¶¶ 3-4.  Plaintiff's claims arise out of a dispute over the terms of plaintiff's oral distribution agreement with defendant.  Dkt. No. 3 at ¶ 2.

On January 4, 2013, plaintiff's principal met with defendant's regional manager to discuss the possibility of an agreement.  Dkt. No. 35-3 at 9:22-24, 10:17-20, 25:8-16; Dkt. No. 35-8 at 47:16-20.  Plaintiff's principal contends that defendant's representative agreed during the course of their conversation not to sell to any of plaintiff's customers directly.  Dkt. No. 35-8 at 52:6-17.  Defendant's regional manager testified to promising not to sell "to your customers up

and down the street . . . like your schools, things along those lines." Dkt. No. 35-3 at 38:4-39:6, 59:3-9.  However, he testified that "for large national account customers, those need to be handled through us . . ." Id. at 39:6-12, 59:9-11.  Plaintiff began serving as a distributor for defendant about two weeks later.  Dkt. No. 35-8 at 25:15-20, 52:18-21.

The parties' dispute is over equipment sales and service work to one customer, Kellermeyer Bergensons Services (KBS), a national building service contractor.  Id. at 49:20-50:18.  Plaintiff informed defendant at the January 4, 2013 meeting that plaintiff performed service work for KBS' equipment and discussed the potential for equipment sales to KBS.  Id. at 48:9-49:11.  Plaintiff made its first sales of several pieces of defendant's cleaning equipment to KBS in July 2013.  Id. at 101:18-103:12; Dkt. No. 35-34 at ECF p. 2-3, 9.  Plaintiff continued to sell cleaning equipment to KBS through March 2014.  Dkt. No. 31-18 at ECF p. 11-14; Dkt. No. 35-35 at ECF p. 25.

In September 2013, defendant contracted with KBS directly to sell cleaning equipment for 500 stores nationally.  Dkt. No. 31-17 at ECF p. 13-14.  In December 2013 and January 2014, KBS negotiated with defendant directly to purchase equipment.  Id. at ECF p. 20-25.  KBS employees testified that for large national accounts, they would not make purchases from distributors but would buy directly from the manufacturer.  Dkt. No. 35-31 at 17:2-18:21; Dkt. No. 35-33 at 13:7-17:12, 27:9-20.

In December 2013, defendant placed plaintiff on a credit hold.  Dkt. No. 31-18 at ECF p. 18-24.  Defendant maintains that plaintiff was placed on a credit hold because plaintiff fell behind on payments.  Id. at ECF p. 18.  Plaintiff contests some outstanding bills as inaccurate and maintains that it should never have been charged for some bills for warranty parts which "should have been free."  Dkt. No. 35-9 at 191:2-194:23, 212:9-20.  In March 2014, plaintiff and

defendant's relationship ended.  Dkt. No. 35-8 at 16:2-8.

Plaintiff filed its complaint on June 6, 2014 and amended its complaint on June 11, 2014.
Plaintiff asserts five claims against the defendant: breach of contract, fraud/misrepresentation,
tortious interference with contractual relations, misappropriation of trade secrets and a claim for
an accounting.  Defendant asserts counterclaims for breach of contract and an account stated.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing
sufficient to establish the existence of an element essential to that party's case, and on which that
party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
The party moving for summary judgment bears the burden of demonstrating that "there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden,
the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is
genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law.
Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

(A) cit[e] to particular parts of materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for
purposes of the motion only), admissions, interrogatory answers,
or other materials; or

(B) show[ ] that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot
produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in

its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

### I.     Plaintiff's Breach of Contract Claim

Defendant argues that plaintiff's breach of contract claim is barred by the statute of frauds.  Specifically, defendant maintains that the parties' agreement is covered by Article 2 of the Pennsylvania Uniform Commercial Code because it is a contract for the sale of goods and that therefore the statute of frauds bars its enforceability beyond any goods actually sold. Plaintiff argues that its contract with defendant is more properly characterized as a brokerage agreement and therefore not covered by the UCC.  For the reasons that follow, I will grant defendant's motion for summary judgment on plaintiff's breach of contract claim.[1]

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."  Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa., 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citation omitted).  An enforceable contract is one where the parties "1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity."  Weavertown Transp. Leasing,

---

[1]     As I will grant defendant summary judgment based on the statute of frauds, I need not address defendant's alternative arguments on waiver, public policy or the merits of plaintiff's breach of contract claim.

Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).

Distribution agreements are typically governed by the UCC as contracts for the sale of goods.  See LightStyles, Ltd. ex rel. Haller v. Marvin Lumber & Cedar Co., No. 1:13-1510, 2015 WL 4078807, at *4 (M.D. Pa. July 6, 2015) (applying the UCC to a distribution agreement between a window and door manufacturer and distributor); D & M Sales, Inc. v. Lorillard Tobacco Co., No. 09-2644, 2010 WL 786550, at *3 (E.D. Pa. Mar. 8, 2010) (applying the UCC to a distribution agreement between a cigarette manufacturer and wholesale supplier); Triple Crown Am., Inc. v. Biosynth AG, No. 96-7476, 1999 WL 305342, at *1 (E.D. Pa. May 14, 1999) (applying the UCC to an exclusive distribution agreement between a melatonin manufacturer and distributor); Weilersbacher v. Pittsburgh Brewing Co., 218 A.2d 806, 807 (Pa. 1966) (applying the UCC to distribution agreement between a brewer and distributor).

Plaintiff relies on three cases to argue that its contract with defendant is not covered by the UCC.  First, plaintiff argues that this case is similar to Horse Soldier, LLC v. Tharpe, No. 1:13-2892, 2014 WL 5312823 (M.D. Pa. Oct. 17, 2014).  The court in Horse Soldier did not apply to the UCC to the parties' agreement where the defendant financed the plaintiff's purchase of rare artifacts, intending for the parties to split the profits upon the sale of the artifacts.  2014 WL 5312823 at *5.  Horse Soldier is easily distinguishable from this case because here the parties did not engage in a joint effort to purchase goods and profit from their sale; defendant sold plaintiff goods which plaintiff then sold to its customers.  See Dkt. No. 35-8 at 71:17-72:19.

Plaintiff also relies on ITP, Inc. v. OCI Co., 865 F. Supp. 2d 672, 679 (E.D. Pa. 2012), a case in which the court was "not persuaded" that the UCC applied to the parties' distribution contract.  The contract in ITP was found to be more of an employment or franchise relationship because it involved the performance of "personal services" by the plaintiff and the plaintiff was

the exclusive distributor of the defendant's goods.  865 F. Supp. 2d at 679.  Unlike the plaintiff

in ITP, plaintiff here was not an exclusive distributor and did not provide the kind of personal

services to defendant which led the court in ITP to find the UCC's provisions inapplicable.

Finally, plaintiff's reliance on Domico v. Downey, No. 06-2474, 2007 WL 2108243

(E.D. Pa. July 19, 2007) is misplaced.  In Domico, the plaintiff agreed to find a buyer for the

defendant's business and would have received a commission on the sale as the broker and agent.

2007 WL 2108243 at *3.  The court found the UCC inapplicable to the parties' agreement

because the defendant engaged the plaintiff for his services rather than to buy or sell goods.  Id.

Despite plaintiff's contention that it "clearly maintained a 'business broker' relationship with the

[d]efendant" like in Domico, the record shows that the parties' relationship involved plaintiff

purchasing defendant's goods and re-selling it to customers to make a profit.  See Dkt. No. 35 at

ECF p. 7; Dkt. No. 35-8 at 39:12-24.  Therefore, Article 2 of the UCC applies to the parties'

distribution agreement.

Accordingly, defendant next argues that its oral promise not to sell to defendant's

customers[2] is rendered unenforceable by the UCC statute of frauds, 13 P.S. § 2201(a).  13 P.S. §

2201(a) requires contracts for the sale of goods for over $500.00 to be in writing to be

enforceable.  The parties agree that they had an oral contract that was never put in writing and

that defendant's cleaning equipment cost more than $500.00.

Public policy dictates that "[t]he purpose of the statute of frauds is to prevent perjury, not

---

[2]       Defendant's argument assumes for the purposes of its motion that it made a broad
promise not to sell to plaintiff's customers when the parties created their oral distribution
contract.  In its briefs, defendant denies that it made a broad promise not to sell to any of
plaintiff's customers.  See Dkt. No. 31-1 at ECF p. 11-12.  However, at oral argument defendant
took the position that for the purposes of its summary judgment motion it will "assume that the
promise [not to have direct sales to plaintiff's customers] was made, that will be disputed as a
matter of fact at trial."  Dkt. No. 43 at 4:23-5:2; 10:13-10:17.

to allow parties to escape their legal obligations." <u>M. Leff Radio Parts, Inc. v. Mattel, Inc.</u>, 706

F. Supp. 387, 394 (W.D. Pa. 1988).  Thus, there are three exceptions to the statute of frauds

enumerated in the UCC: (1) contracts for "specially manufactured" goods unsuitable for resale;

(2) when "the party against whom enforcement is sought admits in his pleading, testimony or

otherwise in court that a contract for sale was made, but the contract is not enforceable under this

provision beyond the quantity of goods admitted"; and (3) "with respect to goods for which

payment has been made and accepted or which have been received and accepted."  13 P.S. §

2201(c).

Plaintiff contends that "there clearly was an agreement" between the parties and "the

record is clear that the [d]efendant performed on the agreement by selling equipment to

[p]laintiff, only to stop once they started dealing with KBS directly."[3]  Dkt. No. 35 at ECF p. 7-

8.  Plaintiff also contends that barring its claim based on the statute of frauds when defendant

chooses not to write down its distribution agreements would "reward[] . . . its shady business

practices."  <u>Id.</u> at ECF p. 8.  Plaintiff cited no authority in either its brief or at oral argument —

other than to list statute of frauds exceptions — in support of its position.  Plaintiff has also not

indicated which statute of frauds exception(s) it relies on in defending its claim.

Defendant's argument focuses on the part performance exception, § 2201(c)(3).

Defendant contends that, at most, § 2201(c)(3) would render the parties' contract enforceable for

goods bought and sold but would not allow plaintiff to "bootstrap . . . a complex, on-going[] non-

compete obligation" onto the contract.  Dkt. No. 31-1 at ECF p. 9, <u>citing</u> <u>Artman v. Int'l</u>

<u>Harvester Co.</u>, 355 F. Supp. 482, 486 (W.D. Pa. 1973) (finding that the part performance

---

[3]      The record does not demonstrate that defendant stopped selling equipment to
plaintiff once defendant began selling to KBS, as plaintiff continued to sell defendant's
equipment to KBS until at least March 2014 while defendant sold equipment to KBS as early as
September 2013.  <u>See</u> Dkt. No. 31-17 at ECF p. 13-14; Dkt. No. 35-35 at ECF p. 25.

exception to the statute of frauds "does not indicate in any way that a delivery of goods shall be construed as binding two parties to a complex on-going franchise relationship.").

 I agree that the part performance exception does not aid plaintiff's defense to the statute of frauds.  Even assuming that defendant made a promise not to sell to plaintiff's customers, plaintiff has failed to set forth any evidence that defendant affirmatively enforced that promise at any time during the parties' relationship.  Compare LightStyles, Ltd. ex rel. Haller v. Marvin Lumber & Cedar Co., No. 1:13-1510, 2015 WL 4078807, at *7 (M.D. Pa. July 6, 2015) (finding a sixteen-year oral distribution agreement unenforceable where the plaintiff failed to "show that [the defendant] recognized by its performance" terms to their contract beyond the sale of goods); with Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1276-77 (3d Cir. 1995) (affirming the enforceability of an oral exclusive distribution agreement because the record showed "more than sufficient evidence" that the defendant made a promise "and acted on it" by affirmatively upholding the parties' exclusive distribution agreement for over a year).

 Defendant does not address the application of § 2201(c)(2) to the parties' contract.[4] However, since § 2201(c)(2) explicitly links its application only to the extent of "the quantity of goods admitted" and not to other contract terms, it would not prevent the statute of frauds from applying to bar plaintiff's claim.

 Therefore, I find that the parties' contract is enforceable only to the extent of goods sold between defendant and plaintiff.  Plaintiff's breach of contract claim is thus barred by the statute of frauds.

---

[4] Section 2201(c)(1) is plainly inapplicable as this case involves no specially manufactured goods.

## II.        Plaintiff's Tort Claims

Defendant argues that plaintiff's claims for fraud and tortious interference with contractual relations are barred by the gist of the action doctrine.  For the reasons that follow, I agree and will grant defendant's motion for summary judgment on plaintiff's tort claims.[5]

Pennsylvania's gist of the action doctrine is a common law doctrine that "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims."  Jones v. ABN Amro Mortgage Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010), quoting Erie Ins. Exch. v. Abbott Furnace Co., 972 A.2d 1232, 1238 (Pa. Super. Ct. 2009) (citations omitted).  "The nature of the duty alleged to have been breached . . . [is] the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract."  Dommel Properties LLC v. Jonestown Bank & Trust Co., No. 14-3564, 2015 WL 5438847, at *3 (3d Cir. Sept. 16, 2015), quoting Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014).  A breach of duty may arise from contract law when the duty is "created by the parties by the terms of their contract" or from tort law when it involves a "broader social duty owed to all individuals."  Bruno, 106 A.3d at 68 (citations omitted).

### A.        Fraud/Misrepresentation

Defendant argues that plaintiff's fraud claim is barred by the gist of the action doctrine because it sounds in contract, not tort.  Dkt. No. 31-1 at ECF p. 17-18.  Assuming for the purposes of this motion that it did make a promise not to sell to plaintiff's customers, defendant maintains that plaintiff's fraud claim is based on defendant's breach of the parties' contract rather than a breach of any external social duty.  Id.

---

[5]        Because I will grant defendant's motion for summary judgment on both of plaintiff's tort claims based on the gist of the action doctrine, I need not address defendant's alternative arguments on the economic loss doctrine or the merits of the claims.

Plaintiff contends that its contract claim is separate from its claim that defendant made false representations to induce plaintiff to enter into a distributor relationship "in an attempt to gain insider access to KBS . . ." Dkt. No. 35 at ECF p. 17. Plaintiff does not clearly identify whether it claims fraud in the inducement of its contract with defendant or fraud in the contract's performance. However, courts have stressed that "[t]he particular theory of fraud—whether it lies in inducement or performance—is not dispositive." Vives v. Rodriguez, 849 F. Supp. 2d 507, 519 (E.D. Pa. 2012) (citation omitted). Instead, the Court of Appeals has stated that the gist of the action doctrine "call[s] for a fact-intensive judgment as to the true nature of a claim." Williams v. Hilton Grp. PLC, 93 F. App'x 384, 386 (3d Cir. 2004).

If plaintiff claims fraud in the performance of the contract, defendant's alleged fraud in failing to fulfill its agreement duplicates plaintiff's breach of contract claim exactly. When a breach of duty has been "created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." Bruno, 106 A.3d at 68 (citations omitted).

If plaintiff claims that defendant made a fraudulent representation to induce plaintiff to enter into a contract with defendant, defendant's representation became a term of their contract. Decisions within this Circuit have repeatedly found that the gist of the action doctrine can bar claims of "fraudulent inducement to enter into . . . a contract where the false representation concerned duties later enshrined in the contract."[6] See Vives, 849 F. Supp. 2d at 518 (citing

---

[6] There is currently a split in authority between the Pennsylvania Superior Court and this Circuit over the applicability of the gist of the action doctrine in fraudulent inducement claims when a party misrepresents its intent to perform under a contract. Many courts in this Circuit have adopted the persuasive reasoning in Judge Dalzell's Vives opinion to find the gist of the action doctrine applicable to fraudulent inducement claims in such cases. See, e.g., Roberts

cases).  In this case, the promise that defendant made to induce plaintiff to enter into a contract is the same promise that plaintiff claims defendant broke as term of that contract.  Thus, I will grant summary judgment to defendant on plaintiff's fraud claim because the claim sounds in contract and is barred by the gist of the action doctrine.

**B.      Tortious Interference with Contractual Relations**

Defendant contends that plaintiff's tortious interference claim is also barred by the gist of the action doctrine because defendant's alleged interference with plaintiff's relationship with KBS is the entire basis for plaintiff's breach of contract claim.  Plaintiff cites no authority to rebut the applicability of the gist of the action doctrine.

The gist of the action doctrine applies to tortious interference claims.  Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 505 (E.D. Pa. 2008) ("A tortious interference with contract claim is barred by the gist of the action doctrine if it is not independent of a contract claim that is pled along with it.").  A duty not to compete with a business' customers can result only from a contract and not from an independent social policy.  See Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc., 170 F. App'x 805, 809-10 (3d Cir. 2006) (affirming dismissal of a plaintiff's tortious interference claims based on the gist of the action doctrine because the plaintiff did "not have a right to be free from competition and [the defendant had] no duty 'imposed by law as a matter of social policy' not to compete with [the plaintiff]").  Here, the parties' contract defined whether defendant could sell to plaintiff's customers; no broader social policy would have prevented defendant from soliciting them.  Therefore, I will grant summary

---

Tech. Grp., Inc. v. Curwood, Inc., No. 14-5677, 2015 WL 5584498, at *13 (E.D. Pa. Sept. 23, 2015); Wen v. Willis, No. 15-1328, 2015 WL 4611903, at *6 (E.D. Pa. July 31, 2015); Agrotors, Inc. v. Ace Glob. Markets, No. 1:13-1604, 2014 WL 690623, at *5 (M.D. Pa. Feb. 24, 2014); Oldcastle Precast, Inc. v. VPMC, Ltd., No. 12-6270, 2013 WL 1952090, at *10 (E.D. Pa. May 13, 2013); Bengal Converting Servs., Inc. v. Dual Printing, Inc., No. 11-6375, 2012 WL 831965, at *4 (E.D. Pa. Mar. 13, 2012).

judgment to defendant on plaintiff's tortious interference claim because the claim sounds in

contract and is barred by the gist of the action doctrine.

**III.    Plaintiff's Misappropriation of Trade Secrets Claim**

Defendant contends that plaintiff cannot sustain its misappropriation of trade secrets

claim because the information plaintiff seeks to protect is not a trade secret and plaintiff failed to

take reasonable steps to protect it.  For the reasons that follow, I will grant summary judgment

for defendant on plaintiff's trade secrets claim.

The Pennsylvania Uniform Trade Secrets Act defines a trade secret as:

Information, including a formula, drawing, pattern, compilation including
a customer list, program, device, method, technique or process that:

(1)    Derives independent economic value, actual or potential, from not
being generally known to, and not being readily ascertainable by proper
means by, other persons who can obtain economic value from its
disclosure or use.

(2)    Is the subject of efforts that are reasonable under the circumstances
to maintain its secrecy.

12 P.S. § 5302.  Pennsylvania courts use the following factors to decide whether information

constitutes a protected trade secret:

(1) the extent to which the information is known outside of the company's
business; (2) the extent to which the information is known by employees
and others involved in the company's business; (3) the extent of the
measures taken by the company to guard the secrecy of the information;
(4) the value of the information to the company and its competitors; (5)
the amount of effort or money the company spent in developing the
information; and (6) the ease or difficulty with which the information
could be acquired or duplicated legitimately by others.

Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010), citing Crum v.

Bridgestone/Firestone N. Am. Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006).

Plaintiff claims that the identity of KBS as its customer is a protected trade secret,

including KBS' habits, pricing, and buying history.  See Dkt. No. 3 at ¶ 60.  A trade secret may

not be "a matter of general knowledge in the industry."  Rohm & Haas Co. v. Adco Chem. Co.,

689 F.2d 424, 431 (3d Cir. 1982).  Thus, information may not be a trade secret if it is "easily or

readily obtained, without great difficulty, through some independent source other than the trade

secret holder."  BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd., 791 F. Supp. 489, 545 (E.D. Pa.

1992).

Compiled information may be protected as a trade secret when it "gives one business an

opportunity to obtain an advantage over competitors."  Iron Age Corp. v. Dvorak, 880 A.2d 657,

663 (Pa. Super. Ct. 2005).  As one form of compiled information, customer lists may be entitled

to trade secret protection, but they "are at the very periphery of the law of unfair competition."

Id. (citation omitted); see Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 706 (E.D. Pa.

2014) (explaining that the value of customer lists "is in the compilation, categorization, and

organization of information on thousands of customers, combined with the ability to search and

format it into a readily usable form.  This is what a competitor does not have and cannot easily

recreate.").

Plaintiff's argument that its relationship with one client merits trade secret protection is

not persuasive.  First, although plaintiff compares KBS' information with a customer list,

plaintiff cannot show that its relationship with KBS or KBS' buying habits were not readily

ascertainable to defendant.  As the Court of Appeals found in SI Handling Sys., Inc. v. Heisley,

753 F.2d 1244, 1258 (3d Cir. 1985), unlike customer lists, having contacts within "only one

customer that is well-known in the industry and that, the record shows, actively seeks to

disseminate [its] information" is not a trade secret.  See also Synthes, 25 F. Supp. 3d at 706-07

(comparing protected trade secret information that consisted of compiled information on

13

thousands of customers with data on a "single product, single vendor, or single customer").

The record shows that KBS is a large, well-known company in its industry that regularly attends trade shows and actively solicits sales proposals from industry suppliers. See Dkt. No. 37-2 at ¶ 13. Additionally, plaintiff's president testified to being "certain" that defendant knew that KBS was plaintiff's client before the parties' contract because "[t]his is a very close knit industry. Everybody pretty much knows who everybody is working with . . . . everybody knows who buys what equipment in this industry." Dkt. No. 35-8 at 48:3-8, 48:16-49:11. Therefore, information regarding KBS and its purchasing practices would not have been difficult for defendant to independently discover.

Plaintiff also cannot show that it kept information about KBS confidential from others in the industry. Plaintiff primarily relies on one case to support its position that the identity of KBS and information about KBS was a secret, O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1066 (Pa. Super. Ct. 2003). The court in O.D. Anderson found that a customer list of over forty customers on which the plaintiff relied for half of its business was subject to protection as a trade secret. 815 A.2d at 1065-66, 1071. The plaintiff in O.D. Anderson took affirmative steps to protect its customer lists, including vigilantly restricting access and even password-protecting them. Id. at 1071.

However, plaintiff has failed to show that it took affirmative measures to protect KBS' identity or information. Plaintiff's president testified only that plaintiff's employees do not discuss its clients except with those they trust. Dkt. No. 35-9 at 201:22-202:16. Plaintiff's president also expressed concern to defendant's representative at the January 4, 2013 meeting about revealing its relationship with KBS. Dkt. No. 35-3 at 40:3-16; Dkt. No. 35-8 at 54:18-55:21. Expressing concern for exposing information about a supposedly critical client is not the

same as taking measures to guard secret information.  See Solid Wood Cabinet Co. v. Partners Home Supply, No. 13-3598, 2015 WL 1208182, at *4-5 (E.D. Pa. Mar. 13, 2015) (entering summary judgment for the defendant in a trade secrets claim where the plaintiff failed to show that it "took any steps to maintain the confidentiality of its customer lists" such as imposing confidentiality requirements or agreements on companies it worked with); see also Synthes, 25 F. Supp. 3d at 707 (granting trade secret protection to compiled information where the plaintiff "had in place numerous measures to maintain [its] secrecy . . . including policies, nondisclosure contracts with employees and vendors, and physical security measures").  Thus, I will grant summary judgment for defendant on plaintiff's misappropriation of trade secrets claim.

**IV.    Plaintiff's Accounting Claim**

Plaintiff's final claim is for "a complete accounting of all direct sales made to its customers by [d]efendant."  Dkt. No. 3 at ¶ 66.  Defendant argues that plaintiff is not entitled to an accounting because plaintiff cannot sustain a claim under either a legal or equitable theory of accounting.  For the reasons that follow, I will grant defendant's motion for summary judgment on plaintiff's accounting claim.

In order to establish a right to a legal accounting under Pennsylvania law, a plaintiff must show:

> (1)    there was a valid contract, express or implied, between the parties whereby the defendant
>
>> (a)    received monies as agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for the monies received by the defendant, or
>>
>> (b)    if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendant failed to account and the plaintiff is

> unable, by reason of the defendant's failure to account, to state the
> exact amount due him, and
>
> (2)      that the defendant breached or was in dereliction of his duty under
> the contract.

Haft v. U.S. Steel Corp., 499 A.2d 676, 677-78 (Pa. Super. Ct. 1985).

Under an equitable accounting theory, Pennsylvania courts have held that "[a]n equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law." Rock v. Pyle, 720 A.2d 137, 142 (Pa. Super. Ct. 1998) (citations omitted). "Equitable jurisdiction for an accounting does not exist merely because the plaintiff desires information that he could obtain through discovery." Buczek v. First Nat. Bank of Mifflintown, 531 A.2d 1122, 1124 (Pa. Super. Ct. 1987).

Plaintiff argues that it is entitled to either a legal or equitable accounting because it "had a valid oral contract with [d]efendant . . . [and] the parties clearly had a relationship that created a legal duty on the part of the defendant to account." Dkt. No. 35 at ECF p. 38-39. Plaintiff does not cite to the record or to any relevant authority to support a legal accounting theory. As there is no evidence in the record that the parties' contract imposed a legal duty upon defendant to account to plaintiff, plaintiff's legal accounting theory fails. Plaintiff's claim also fails under an equitable accounting theory because plaintiff has not shown that defendant was in a fiduciary relationship with plaintiff or that the parties had shared accounts.[7] Therefore, I will grant

---

[7]      A fiduciary relationship is one where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." Commonwealth, Dep't of Transp. v. E-Z Parks, Inc., 620 A.2d 712, 717 (Pa. Commonw. Ct. 1993) (citation omitted). A business relationship involves a fiduciary duty "only if one party surrenders substantial control over some portion of his affairs to the other." Id. (citation omitted).

defendant's motion for summary judgment on plaintiff's accounting claim.

## V.     Defendant's Breach of Contract and Account Stated Counterclaims

Defendant has moved for summary judgment on its breach of contract and account stated counterclaims for an alleged outstanding balance of $26,142.00 in plaintiff's account with defendant.  Plaintiff admits to an outstanding balance but contests the amount.  For the reasons that follow, I will grant in part and deny in part defendant's motion for summary judgment on its breach of contract counterclaim and deny the motion on defendant's counterclaim for an account stated.

Defendant claims that plaintiff breached its contract with defendant by failing to pay the balance it owed for equipment under the parties' contract.  To prevail on a breach of contract claim under Pennsylvania law, a party must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa., 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citation omitted).  Plaintiff concedes that the parties had a contract and that "there was an outstanding balance owed to [d]efendant" for equipment.  Dkt. No. 35 at ECF p. 39; see Dkt. No. 35-9 at 191:2-193:5.  Thus, defendant's motion for summary judgment will be granted as to plaintiff's liability for defendant's breach of contract counterclaim.

Defendant argues that it is also entitled to summary judgment on the issue of damages. Plaintiff contests the accuracy of defendant's damages calculation.  Defendant relies on a customer ledger and supporting invoices to argue that plaintiff owes defendant an outstanding balance of $26,142.00 from July 29, 2013 through January 21, 2014.  See Dkt. No. 31-18 at ECF p. 7-16.  Plaintiff challenges the amount because "[t]here were numerous items that we were in dispute over" due to returned equipment discrepancies.  Dkt. No. 35-9 at 191:2-193:5.  Plaintiff

also relies on an unlabeled document that appears to be a ledger listing defendant's equipment

sales and returns, including sales to plaintiff, from February 7, 2013 through September 10,

2014.  Dkt. No. 31-17 at ECF p. 2-3.  This document does not link or in any way credit returned

equipment to plaintiff.  See id.  Aside from its president's testimony that defendant's ledger was

inaccurate, plaintiff has not provided or cited to additional evidence such as conflicting invoices,

credit memos or additional ledgers to support its contention that it owes a different amount.

Plaintiff has not presented a figure that it believes it owes.

 However, defendant's records do contain inconsistencies.  Defendant sent plaintiff a

letter on April 3, 2014 with an updated customer ledger from December 17, 2013 through April

2, 2014 that includes an amount credited to plaintiff and a different balance than in January 2014.

Dkt. No. 31-18 at ECF p. 21-22.  Defendant also sent an internal email regarding plaintiff's

balance that mentions a payment plaintiff made on February 26, 2014 which is not clearly

reconcilable with either ledger.  See id. at ECF p. 18.  Defendant's briefs do not address the

differences between the January 2014 and April 2014 ledgers, why they rely solely on the

January 2014 ledger or how plaintiff's payment was credited.  As there remains a genuine issue

of material fact relating to damages in its breach of contract counterclaim, I will deny

defendant's motion for summary judgment as to the issue of damages.

 Defendant also seeks damages for the same balance by asserting another variety of

breach of contract claim: a claim under Pennsylvania law for an account stated.  See Richburg v.

Palisades Collection LLC, 247 F.R.D. 457, 464 (E.D. Pa. 2008) (describing an account stated

claim as traditionally arising "when two parties, who engage in a series of transactions with one

another, come together to balance the credits and debits and fix upon a total amount owed. . . .

This final tally, once assented to, becomes the 'account stated,' and any further cause of action is

based on this 'account stated' rather than on any of the underlying transactions.").  Neither party cites to authority about the merits of the account stated counterclaim.  However, defendant has established liability in its breach of contract counterclaim and only the issue of the amount of damages remains.  Therefore, I need not assess defendant's alternate theory of liability for the same damages under an account stated claim because defendant cannot recover those damages twice.  See R.W. Sauder, Inc. v. B.F. Agric. Acquisition, LLC, No. 5:14-00769, 2015 WL 6503385, at *4 n.5 (E.D. Pa. Oct. 28, 2015).

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment will be granted in part and denied in part.  I will grant summary judgment for defendant on plaintiff's claims of breach of contract, fraud/misrepresentation, intentional interference with contractual relations, misappropriation of trade secrets and an accounting.  I will grant summary judgment in part on the issue of liability for defendant's breach of contract counterclaim.  In all other respects, I will deny defendant's motion.

An appropriate Order follows.